**MADDA TRADING COMPANY,**
**Plaintiff, Counter-defendant**

v.

**William WIMBISH, Defendant,**
**Counter-plaintiff.**

**No. 78 C 1621.**

United States District Court,
N. D. Illinois, E. D.

Jan. 27, 1982.

Joel J. Bellows, Chicago, Ill., for plaintiff, counter-defendant.

Robert A. Korenkiewicz, Chicago, Ill., for defendant, counter-plaintiff.

ORDER

BUA, District Judge.

Plaintiff, Madda Trading Company, brings this claim against defendant, William Wimbish, for damages arising out of a deficit in the defendant's commodity futures trading account. Defendant has filed a counterclaim seeking damages on various theories of common law fraud. The court has jurisdiction of this matter pursuant to Title 28, Sec. 1332. A trial on the merits of the parties' claims was conducted by the court. After consideration of the evidence and testimony presented at trial, this court makes the following findings of fact and conclusions of law.

FINDINGS OF FACT

1. Plaintiff, counter-defendant, Madda Trading Company, (hereinafter referred to

as Madda), is a Delaware corporation having its principal place of business in Illinois.

2. Defendant, counter-plaintiff, William Wimbish, is a resident of Georgia.

3. At all times relevant to this case, Madda was engaged in the commodity brokerage business and was a registered futures commission merchant. See 7 U.S.C. § 6d.

4. On or about August 28, 1975, Wimbish executed Madda's Customer Application and Agreement form in order to open a commodity futures contract trading account with Madda. Wimbish kept a copy of this Agreement in his office files.

5. Prior to opening the Madda account, Wimbish had opened a commodity futures contract trading account with R. J. O'Brien & Associates, Inc. (hereinafter referred to as R. J. O'Brien) on August 20, 1975 with an initial investment of $10,000.00.

6. Prior to the August 20, 1975 opening of his trading account with R. J. O'Brien, Wimbish had never speculated in the commodities market.

7. Wimbish was persuaded to speculate in commodities futures contracts by William Cato, Sr. (hereinafter referred to as Cato).

8. Cato first met Wimbish in February of 1975 when Cato opened an office as a broker representative of R. J. O'Brien which was located next door to the office occupied by Wimbish. Thereafter, Cato and Wimbish became acquainted with each other through casual office visits.

9. In April or May of 1975 Cato began to suggest that Wimbish trade commodity futures contracts. Wimbish testified that over the course of the summer Cato stated that he had traded in the commodities market all of his life, that he knew how to make money in this market, and that he had made over $100,000 in the market during the previous year. Wimbish also testified that Cato had stated that he traded heavily on a daily basis utilizing a foolproof system of watching market fluctuations which minimized potential losses to one to two hundred dollars on each complet-

ed trade. Wimbish qualified his testimony on cross-examination by admitting that Cato never mentioned a specific loss limit figure in their conversations. Wimbish also testified that Cato represented that he made money for all his clients and that Wimbish should be able to earn ten to fifteen percent per month on his investment. Wimbish further testified that Cato never informed him that he had been "wiped out" in July, 1975. No proof, however, was offered that Cato had in fact suffered any losses in July, 1975. All of the above statements occurred prior to Wimbish opening his account with R. J. O'Brien. Cato finally convinced Wimbish to make an initial investment of $10,000 on or about August 20, 1975, at which time Wimbish opened a discretionary trading account with R. J. O'Brien and executed a limited power of attorney authorizing Cato to conduct trading in futures contracts on his behalf. Wimbish specifically authorized Cato to trade contracts on margin for his account.

10. On or about August 28, 1975, Cato informed Wimbish that he was changing brokerage houses and that he wanted Wimbish to authorize the transfer of his account from R. J. O'Brien to Madda. Wimbish agreed and executed a document which requested R. J. O'Brien to transfer all positions and equity to Madda. At this time Wimbish also executed Madda's Customer Application and Agreement form at Cato's request. Wimbish testified that he never read the form. The first paragraph of the Customer Agreement states:

1. Customer acknowledges that investment in commodity futures contracts is speculative, involves a high degree of risk and is suitable only for persons who can assume the risk of substantial losses. Customer also understands that because of the low margin normally required in commodity futures trading, price changes in commodity futures contracts may result in significant customer losses, which losses may substantially exceed customer's investment and margin deposit.

11. When the Madda account was opened, Wimbish had $10,220. in his account with R. J. O'Brien. This amount was transferred to Madda on September 10, 1975 pursuant to Wimbish's request. Thereafter, from September 11 through November 3, 1975, Cato traded on an almost daily basis for Wimbish.

12. Wimbish received daily statements mailed from Madda's Chicago office which disclosed all trades made on his account on the date of the statement. The daily statements showed Wimbish's account balance before the trades, the purchases or sales made on that date, and the account balance at the end of the day. Wimbish received these statements approximately three days after the date of the transactions. Each of these statements disclosed the profit or loss and the commission charges on each trade completed.

13. In addition to these daily trading statements, Wimbish received monthly statements from Madda. These statements showed all purchases, sales, cash investments and adjustments made on Wimbish's account for the month. In addition, the statement disclosed commissions charged on completed trades, the net profit or loss for the month on each completed trade, the total profit or loss on trades for the month, and the cash balance in the customer's account as of the date of the statement. This monthly statement also indicated all open positions held by Wimbish at the end of the month, the purchase price of each open position, and the trade price of that open position as of the date of the monthly statement. A cursory review of these statements would accurately indicate to a customer his potential profit or loss on his open contract positions. In fact, the monthly statements included, for each open position, the total dollar amount of the unrealized gain or loss on each open position, and the total dollar amount of the unrealized gain or loss on all open positions. This total was then added to or subtracted from the account balance to show the total net equity in the account at the end of the month. For example, a cursory review of Mr. Wimbish's September 30, 1975 monthly statement indicates that his open positions exposed him to a loss of over $2,700 of his initial investment of $10,220. On completed trades he had realized $807 profit by September 30, 1975, but his open positions as of that date exposed him to a $3,513.50 loss for a net loss of $2,706.50.[1]

14. Wimbish has been a self-employed manufacturer's sales representative for over 29 years. He appeared on the witness stand to be an intelligent individual. He knew at all times relevant to this lawsuit that trading in futures contracts was a highly speculative and risky venture. Prior to the transactions at issue in this case Wimbish had traded stocks on margin. He knew that trading on margin enables an investor to make highly leveraged investments. In fact, he testified that Cato had informed him of this and had provided him with a book on trading futures contracts. He also knew that a downward fluctuation of the price of the commodity could result in a margin call requiring the deposit of additional funds or a loss in excess of his entire initial investment. In addition, Wimbish was aware that the failure to meet a margin call would result in the liquidation of his open positions. Wimbish also testified that he knew people could "get trapped in the market from time to time, locked in and not be able to liquidate their positions." This court is firmly convinced that Mr. Wimbish knew in fact that he was engaged in a very risky endeavor when he began trading through Cato and Madda, and that he was fully aware that he could suffer large losses.

15. The court is not persuaded by Wimbish's testimony that Cato stated he had a "fool-proof" method of trading in commodi-

1. A trader of commodities futures contracts does not realize a profit or loss on a transaction until the trader makes an offsetting purchase or sale to cover his open contract positions. Commissions are charged when an open position is covered by an offsetting transaction. Commissions are charged on all completed trades, whether or not the trade results in a gain or a loss for the trader.

ties futures contracts without risk of loss or that Cato misled Wimbish by promising or guaranteeing Wimbish a ten percent per month return on his investment. The court finds that although Wimbish succumbed to Cato's salesmanship, Cato did not make any material misrepresentations or omissions of fact or other false statements constituting fraud and that Wimbish knowingly decided to engage in a speculative venture in relying on Cato's abilities as a trader. The court does not believe that Cato stated to Wimbish that he had made $100,000 in trading in the prior twelve months. Moreover, even if Cato did state that he had made $100,000 in the previous years, there is no evidence to indicate that this statement was false or misleading. Nor is there any evidence that Cato was financially destroyed in July of 1975.

16. Cato made daily oral reports to Wimbish of the results of each day's trading. These reports were accurate.

17. On October 2, 1975 Wimbish met a margin call by depositing $5,000 in his Madda account. On October 22, 1975 Wimbish met another margin call by giving Cato a check for $10,000. Wimbish received a total of fourteen margin call notices in October, 1975. The court believes that Wimbish was fully aware of the significance of the margin calls he received from Madda. In addition, the court believes that Cato encouraged Wimbish to "hang-in" the market on and after October 31, 1975. The court also believes that Wimbish knew that because of the precipitous drop in the price of February and March pork bellies, of which he held seven open long positions, his loss exposure was large and that he decided to cut his losses rather than risk further losses after November 3, 1975. Therefore, Wimbish ordered Cato to immediately close his account on the morning of Monday, November 3, 1975. Cato immediately closed the account.

18. The closing of the account resulted in a loss of over $40,000 on the seven open pork belly positions and resulted in a deficit balance in the account with Madda of $11,599. Of the seven open pork belly positions that Wimbish ordered offset when he told Cato to close the account, five were March pork bellies purchased on October 10, 1975 and two had been February pork bellies purchased on October 17, 1975. The price decrease of pork bellies during October was attributable at least in part to the release of a government report which found that carcinogens were present in bacon. The court is not persuaded by Wimbish's testimony that any statement made by Cato to Wimbish on or prior to August 20, 1975 was false or misleading.

Moreover, since Wimbish, according to his own testimony, received accurate contemporaneous reports of profits and losses directly from Cato, the court does not believe that Cato told Wimbish that Wimbish had made fifteen percent profit in September thus motivating Wimbish to invest another fifteen percent. Mr. Wimbish received a total of fourteen margin calls in the mail between September and November, 1975. Wimbish was also informed in person by Cato on the date of each call that his account was undermargined. Wimbish examined each statement he received from Madda with particular regard to "the bottom line." Wimbish did not concern himself with the particular trades made for his account, but only with his account balance. In addition, Wimbish's denial on the witness stand of comprehending the significance of the "net equity" entries on the Madda monthly statements is incredible. The court believes that this experienced and intelligent businessman well knew the significance of his net equity position, and this is especially true in light of his prior experience of investing in securities on margin. The September monthly statement indicated a net loss of $2,700.00 and the court finds that Wimbish was in fact aware of this loss exposure when he received the September 30, 1975 monthly statement. In fact, he had no problem reading the account statements on the witness stand even though he denied any ability to read them correctly at the time of trial.

19. The court does not believe Wimbish's testimony that Cato never told him

that "he needed money to cover a margin." In fact, Wimbish's testimony established to this court's satisfaction that the October 2 and October 29 payments made to Madda were in direct response to margin calls personally conveyed to Wimbish on those dates by Cato. This court's conclusion is supported by evidence that, at least with respect to the $5,000 payment on October 2, Wimbish had received the September 30, 1975 monthly statement reporting a substantial potential loss over twenty-five percent of his initial investment. Mr. Wimbish's cursory glance at the "bottom line" showed him the $2,700 unrealized loss.

20. In conclusion, the court finds that the losses sustained by Wimbish were a result of his knowing participation in a highly speculative investment. The court is not persuaded that these losses were caused by any misrepresentation on the part of Cato, nor is the court persuaded that any misrepresentation did in fact occur.

### CONCLUSIONS OF LAW

1. This court has jurisdiction of this matter pursuant to 28 U.S.C. § 1332 and the amount in controversy exceeds $10,000, exclusive of interest and costs.

2. On or about August 28, 1975 Madda and Wimbish entered into a contract whereby Wimbish opened an account with Madda for the purpose of trading in commodity future contracts.

3. On November 3, 1975, Madda, acting pursuant to the authority granted to it by Wimbish, liquidated Wimbish's existing open positions resulting in Wimbish incurring a deficit in his account of $11,599.

4. By virtue of the Customer Agreement, Wimbish is obligated to pay to Madda the deficit of $11,599, interest thereon, and reasonable attorney's fees incurred as a result of the deficit.

5. The court finds that Wimbish has breached the Customer Agreement by his failure to pay this deficit pursuant to the terms of the agreement and therefore enters judgment in favor of Madda for $11,-599, interest from November 3, 1975, and reasonable attorney's fees.

6. The court also finds that Wimbish failed to prove by clear and convincing evidence any fraud on the part of Madda or its agents and therefore, the court enters judgment against Wimbish on his counterclaim.

For the reasons stated, the Clerk of the Court is directed to enter judgment in favor of the plaintiff, Madda Trading Company, in the amount of $11,599 with interest thereon from November 3, 1975, including reasonable attorney's fees, and to enter judgment against the defendant, William Wimbish, on his counterclaim.

IT IS SO ORDERED.